UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-60197-CR-SMITH/VALLE

18 U.S.C. § 371
18 U.S.C. § 982(a)(2)(A)

UNITED STATES OF AMERICA

vs.

KEITH MAHLON DUNKLEY,

Defendant.
_____/

FILED BY_____D.C.
OCT 06 2023
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Information:

*The Small Business Administration*

1. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

2. As part of this effort, the SBA enabled and provided loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

*The Paycheck Protection Program*

3. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020, designed to provide emergency financial assistance to the

millions of Americans who were suffering from the economic effects caused by the COVID-19 pandemic. One source of relief that the CARES Act provided was the Paycheck Protection Program ("PPP"), which authorized forgivable loans to small businesses for job retention and certain other expenses.

4. The SBA promulgated regulations concerning eligibility for a PPP loan. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation on February 15, 2020, and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. Payments to independent contractors are typically reported to the Internal Revenue Service ("IRS") on a "Form 1099-MISC." In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.

5. In addition, a business applying for a PPP loan was required to provide documentation showing its payroll expenses. This payroll information was material to the application because, pursuant to statutory requirements and implementing regulations, the amount of the loan that typically could be approved was a function of the applicant's historical payroll costs, consisting of compensation to its employees whose principal place of residence was the United States, subject to certain exclusions.

6. Individuals who operated a business under a "sole proprietorship" business structure were eligible for a PPP loan. To qualify for such a PPP loan, individuals had to report and document their income and expenses from the sole proprietorship. Sole proprietorships typically report their income and expenses yearly to the IRS on a "Form 1040, Schedule C." As with other PPP loans, this information and supporting documentation was used to calculate the amount of money the individual was entitled to receive under the PPP. The maximum PPP loan amount for a sole proprietor with no employees was $20,833.

7. PPP loan applications were processed by participating lenders and third-party loan processors. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

8. After the lender funded the PPP loan to the borrower, the lender submitted disbursement details into the SBA E-Tran system, with servers located in Sterling, VA. The SBA's Denver Finance Center, located in Denver, Colorado, created payment files and authorized payments of the PPP processing fee to the lender through the Financial Management System to the Treasury. The primary server for the Financial Management System was in Sterling, VA. The PPP processing fee varied depending on the amount of the loan. Once created, the payment files were then transmitted via wire to the U.S. Treasury disbursing office in Kansas City, Missouri, which, in turn, sent instructions for payment of funds to the Federal Reserve Bank Automated Clearing House processing site in East Rutherford, New Jersey.

9. The proceeds of a PPP loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments for the business. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, or jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

10. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the borrower utilized 60% of the loan in the 24 weeks post-disbursement toward payroll costs and utilized the remaining 40% on qualified expense items (e.g., mortgage, rent, and utilities).

11. Applying for PPP loan forgiveness was a separate process that required additional affirmations that the applicant satisfied the eligibility for PPP loan forgiveness. Whatever portion of the PPP loan was not forgiven was serviced as a loan.

### *The Economic Injury Disaster Loan Program*

12. Another related response to the COVID-19 outbreak was an expansion of an existing disaster-related program administered by the SBA, the Economic Injury Disaster Loan ("EIDL") program, to provide loans up to $150,000, and additional advance funds of up to $10,000, for small businesses experiencing a temporary loss of revenue due to the pandemic.

13. To qualify for an EIDL authorized by the CARES Act, applicants had to be: (1) a business, cooperative, or agricultural enterprise with 500 or fewer employees, a faith-based organization, a private non-profit, a sole proprietorship or an independent contractor; (2) physically located in the United States or a designated territory; and (3) have suffered working capital losses due to the COVID-19 pandemic.

14. EIDL loan amounts were based off a rough calculation of the applicant's net revenues over the six months prior to January 31, 2020. The rough calculation took the difference between the previous annual gross revenues and the previous annual cost of goods sold. That number was divided by two to determine the approved loan amount, up to $150,000.

15. EIDL advance amounts were based off the business's reported number of employees as of January 31, 2020. The SBA provided $1,000 in EIDL advance funds for each employee on the applicant's payroll, up to the maximum amount of $10,000.

16. EIDL proceeds could have been used to pay fixed debts, payroll, accounts payable, and other bills of the business that could have been paid had the disaster not occurred; however, such loan proceeds were not intended to replace lost sales or profits, or for the expansion of a business.

17. Unlike other types of SBA-guaranteed loans, EIDL funds were issued directly from the United States Treasury, and applicants applied for EIDL funds directly through the SBA via an online portal and application. The EIDL application process, which also used certain outside contractors for system support, collected information concerning the business and the business owner, including information about the gross revenues and cost of goods sold for the business prior to January 31, 2020. Applicants electronically certified that the information provided was true and accurate and were warned that any false statement or misrepresentations to the SBA, or any misapplication of loan proceeds may result in sanctions, including criminal penalties.

18. EIDL applications were received in and processed using computer servers located in the states of Iowa, Virginia, and Washington. EIDL disbursement payments were initiated by the SBA using computer servers located in the state of Colorado, which transmitted the payment information to the Treasury using computer servers located in the state of Virginia.

## The Defendant & Related Entity

19. **KEITH MAHLON DUNKLEY** was a resident of Broward County, Florida.

20. Global Group Alliances, LLC was a registered Florida business that was created in or about January 2020. **KEITH MAHLON DUNKLEY** was the Chief Executive Officer and registered agent of Global Group Alliances, LLC.

## Relevant Lender and Loan Processor

21. Lender 1 was an approved lender of PPP loans and was based in Fort Lee, New Jersey.

22. Loan Processor 1 was a third-party loan processor, based in Redwood City, California, that processed PPP loan applications for Lender 1.

## Count 1
## Conspiracy to Commit Wire Fraud
## (18 U.S.C. § 371)

23. The allegations contained in paragraphs 1 through 22 of the General Allegations section of this Information are re-alleged and incorporated by reference as though fully set forth herein.

24. From in or around July 2020, and continuing through in or around January 2022, in Broward County, Florida, in the Southern District of Florida, and elsewhere, the defendant,

**KEITH MAHLON DUNKLEY,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with another unknown to the United States Attorney, to commit an offense against the United States, that is, to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the

pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

25.  It was the purpose of the conspiracy for the defendant and his co-conspirator to unjustly enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent applications for COVID-19 relief funds, including applications for a PPP loan and an EIDL; and (b) offering, paying, and receiving payments in return for the submission of false and fraudulent loan applications.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirator sought to accomplish the purpose of the conspiracy included, among others, the following:

26.  **KEITH MAHLON DUNKLEY** and his co-conspirator submitted and caused to be submitted a fraudulent PPP loan application under the name of **KEITH MAHLON DUNKLEY**, as a sole proprietor, using the defendant's Social Security Number and e-mail address, via interstate wire communications.

27.  **KEITH MAHLON DUNKLEY** submitted and caused the submission of false and fraudulent information and documentation in support of the PPP loan application to Loan Processor 1, via interstate wire communications, including a falsified Internal Revenue Service tax form Schedule C for Global Group Alliances, LLC and false and fraudulent information as to the borrower's gross income and monthly payroll, among other things.

28.  As a result of the false and fraudulent PPP loan application submitted as part of this

scheme, on or about August 4, 2020, Lender 1 approved PPP loan number 2151008204 for **KEITH MAHLON DUNKLEY**, and disbursed the PPP loan proceeds, via interstate wire communication, in the approximate amount of $18,540 to **KEITH MAHLON DUNKLEY** at JPMorgan Chase Bank account number ending in 5715 in the name of **KEITH MAHLON DUNKLEY**.

29. On or about August 4, 2020, **KEITH MAHLON DUNKLEY** also submitted and caused the submission of an EIDL application to the SBA on behalf of Global Group Alliances, LLC, which contained materially false and fraudulent information as to (1) the business's gross revenues for the 12 months prior to January 31, 2020; and (2) the business's number of employees as of January 31, 2020.

30. As a result of the false and fraudulent EIDL application submitted as part of this scheme, on or about August 7, 2020, the SBA approved EIDL number 3532658209 for Global Group Alliances, LLC and disbursed the loan proceeds, via interstate wire communication, in the approximate amount of $17,500 to TD Bank account number ending in 0161 in the name of Global Group Alliances, LLC, which was controlled by **KEITH MAHLON DUNKLEY**.

31. **KEITH MAHLON DUNKLEY** used the ill-gotten loan proceeds to enrich himself and not for qualified expenses under the PPP and the EIDL program.

## **OVERT ACTS**

In furtherance of the conspiracy, and to accomplish its purpose, at least one of the co-conspirators committed and caused to be committed, in Broward County, Florida, the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

32. On July 31, 2020, **KEITH MAHLON DUNKLEY** submitted and caused to be submitted a PPP loan application from the Southern District of Florida through Loan Processor 1 using interstate wire communications, which resulted in PPP loan number 2151008204.

33. On or about August 4, 2020, **KEITH MAHLON DUNKLEY** submitted and caused the submission of an EIDL application from the Southern District of Florida to the SBA, via interstate wire communications, on behalf of Global Group Alliances, LLC, which contained materially false and fraudulent information as to (1) the business's gross revenues for the 12 months prior to January 31, 2020; and (2) the business's number of employees as of January 31, 2020, using interstate wire communications, which resulted in EIDL number 3532658209.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

1. The allegations contained in this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **KEITH MAHLON DUNKLEY**, has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Section 371, specifically, a conspiracy to commit a violation of Title 18, United States Code, Section 1343, as alleged in this Information, the defendant shall forfeit to the United States any property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of such offense, pursuant to Title 18, United States Code, Section 982(a)(2)(A).

3. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

   e.  has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to the forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

  All pursuant to Title 18, United States Code, Section 982 (a)(2)(A), and the procedures set forth at Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

_____
MARKENZY LAPOINTE
UNITED STATES ATTORNEY

_____
TREVOR C. JONES
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: _____

v.

KEITH MAHLON DUNKLEY,

_____/
Defendant.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☒ FTL     ☐ WPB

I do hereby certify that:
1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect: _____

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)              (Check only one)
   I   ☒ 0 to 5 days             ☐ Petty
   II  ☐ 6 to 10 days            ☐ Minor
   III ☐ 11 to 20 days           ☐ Misdemeanor
   IV  ☐ 21 to 60 days           ☒ Felony
   V   ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No
15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: _____
Trevor E. Jones
Assistant United States Attorney
FL Bar No.    0092793

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: KEITH MAHLON DUNKLEY

**Case No**: _____

Count #: 1

Conspiracy to Commit Wire Fraud, Title 18, United States Code, Section 371

* **Max. Term of Imprisonment: 5 years**
* **Mandatory Min. Term of Imprisonment (if applicable): n/a**
* **Max. Supervised Release: 3 years**
* **Max. Fine: $250,000**

*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

FILED BY _____ D.C.

OCT 0 6 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 23-60197-CR-SMITH/VALLE |
| KEITH MAHLON DUNKLEY, | ) | |
| | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*